IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:24cv22423

ADELAI JOSE TINEO,
Plaintiff,

v.

INTERNATIONAL SUSTAINABLE
DEVELOPMENT FUND, LLC,
a Wyoming Limited Liability Corporation,

WILLIAM J. MOURNES,
individually,

MARK ZOUVAZ,
individually,

EDWARD D. EKSTROM,
individually, and

DANIEL MORRIS,
individually,

Defendants.
_____/

# COMPLAINT

## INTRODUCTION

Plaintiff, Adelai Jose Tineo ("Plaintiff" or "Tineo"), by and through his undersigned counsel, files this Complaint against Defendants, International Sustainable Development Fund, LLC ("ISDF"); William J. Mournes ("Mournes"); Mark Zouvaz ("Zouvaz "); Edward D. Ekstrom ("Ekstrom"); and Daniel Morris ("Morris ") (all together hereinafter "Defendants" or "co-conspirators") and alleges as follows:

**JURISDICTION, VENUE, AND THE PARTIES**

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

3. Plaintiff Adelai Jose Tineo is an individual resident of Miami-Dade County and the State of Florida.

4. Defendant International Sustainable Development Fund, LLC is a limited liability company that is active and in good standing and its principal place of business is organized under the laws of Wyoming, with its principal place of business located at 95 S State Street, Suite 2300, Salt Lake City, Utah, 84111.

5. Defendant Mournes is an individual sui juris, with its principal place of abode in the State of New Jersey, namely, 35 Birch Run Ave., Denville, New Jersey, 07834. Mournes is the Managing Member of Defendant International Sustainable Development Fund, LLC.

6. Defendant Zouvaz is an individual sui juris, with its principal place of abode in the State of California, with address 3614 Kingsley St., San Diego, CA 92106.

7. Defendant Ekstrom is an individual sui juris, with its principal place of abode in the State of Utah with address 3308 E Coronet Drive, Holladay Utah, 84124.

8. Defendant Daniel Morris is an individual sui juris, with its principal place of abode in the State of Oregon with address 707 SW Washington Street, #1100, Portland, Oregon, 97205.

**FACTUAL ALLEGATIONS**

1. Plaintiff Tineo and Defendants entered into a consulting agreement whereby Plaintiff agreed to provide comprehensive consulting and advisory services to Waterfall Mountain

International Holdings LTD, ("Waterfall"), its alter ego, ISDF, including business development, commercial advice, and risk assessment.

2.  Over a period of twelve years, Plaintiff provided extensive services to Defendants, significantly contributing to its strategic positioning, business development, and overall success. These services included but were not limited to: a. Identifying and developing new business opportunities for both Waterfall and ISDF. b. Providing expert commercial advice to facilitate strategic decisions. c. Conducting detailed risk assessments in connection with various commercial opportunities. d. Assisting in obtaining regulatory approvals and certifications essential for ISDF's operations, such as getting a READY, WILLING, and ABLE ("RWA") Certificate[1] for eight sovereign bonds (each bond's market value is approximately 8 billion dollars).

3.  Initially, Plaintiff was asked to complete several interviews, which were deemed urgent. On or about January of 2023, Plaintiff began performing additional services at the request of ISDF. Despite efforts to secure an RWA through other individuals, Defendants' attempts were unsuccessful. Subsequently, Plaintiff was repeatedly asked by Defendants Mournes, Zouvas, Ekstrom, and Morris (all officers of Waterfall, and its alter ego, ISDF) to obtain a Venezuelan RWA necessary for filing for the U.S. Treasury Office of Foreign Assets Control (OFAC) license and to get funding in Europe. This was also emphasized by Mr. Ronald A. Oleynik Esq. (hired counsel from Holland & Knight) by insistence on its importance for the license filing.

4.  In March 2023, Plaintiff informed the ISDF board that obtaining the RWA would involve high costs, including travel expenses, attorneys fees, lobbyists, and intermediaries (in the

---

[1] An RWA certificate is typically used in financial and trade transactions to confirm that a party, in this case, the Banco Central de Venezuela, is prepared to proceed with a financial transaction under specified terms and conditions. The RWA certificate confirms that the issuing bank (Banco Central de Venezuela) is ready, willing, and able to engage in a specific financial transaction. This includes the readiness to transfer, block, or otherwise manage financial instruments such as bonds.

United States and Venezuela), to facilitate documentation through the Venezuelan Central Bank. ISDF representatives understood the difficulties and complexity and pleaded for the Plaintiff's assistance due to the urgency, no matter the cost.

5. ISDS made multiple representations regarding its intent and ability to get funding and enter into an RWA.  For example, in order to convince and commit Plaintiff to do the work, on or about April 8, 2023, Mournes sent a text message containing a SWIFT statement showing that he was getting $25,000,000 Euros to Defendant Morris's account and that he would get paid as soon as he got the RWA for them. **See Exhibit A, swift (wire) statement.**

6. By April 2023, Plaintiff secured the necessary approvals for the RWA, emphasizing the critical nature of timely payments and the involvement of his associates and agents in Venezuela.  Plaintiff quoted a cost of approximately $3 to $4 million dollars to have an RWA issued, including **eight** bonds. ISDF representatives, including Defendant Mournes, initially agreed to pay $6 million, but subsequently increased the offer to $8 million, and even $10 million, depending on the urgency and evolving conditions, but at the end, Plaintiff agreed to get $6,000,000 plus $800,000 to pay for his taxes.

6. The RWA Certificate was finally issued on  May 10, 2023, by the VENEZUELAN CENTRAL BANK for WATERFALL MOUNTAIN INTERNATIONAL HOLDINGS LTD[2]. The attached RWA is incorporated by reference here as **Exhibit B**[3]**.**

---

[2] Waterfall Mountain International Holdings LTD and affiliate in the United States, International Sustainable Development Fund, LLC, is Defendant ISDS's alter ego run by individual Defendant William J. Mournes.

[3] This certificate is from the Banco Central de Venezuela (BCV) to Waterfall Mountain International Holdings Ltd. (WMIHL), dated May 10, 2023, confirming the renewal of bond assignments originally made on June 1, 2021, for four terms of one year and one month each with automatic rollovers, contingent on compliance with U.S. Treasury Office of Foreign Assets Control (OFAC) sanctions or submission of an appropriate license and payment of renewal fees, stating that BCV will transfer or block the bonds on Euroclear upon WMIHL's instruction, authorizing WMIHL to use the bonds according to OFAC requirements and applicable prospectuses, asserting that the bonds have clear title, are free from liens, are backed by legitimate funds, and are registered with the National Commission of Securities (CNV), and providing Sohail Hernández Parra, First Vice President at BCV, as the contact for inquiries, thereby

7. Following Plaintiff's diligent work, on or about May 26, 2023, Waterfall submitted the OFAC filing. Mr. Ronald A. Oleynik Esq. confirmed the application status on September 21, 2023, in a letter to Defendant Mournes, attached and incorporated by reference as **Exhibit C**.

8. After receiving RWA and OFAC, the ISDS leadership started claiming they had "ownership" of those bonds and other benefits arising out of the RWA when this was not true. They had been using the RWA document inappropriately.

9. After months of asking for payment, finally, on or about December 16, 2023, Morris and Mournes flew to Miami, Florida, to meet with Plaintiff in person. They met at Morton Steakhouse in Aventura. At this meeting, again, making false promises, they confirmed the RWA was good and could use it, and they would pay me the agreed amount. At this point, Plaintiff also told them that these bonds were sovereign bonds and that they could not state that they had "ownership" since they were sovereign from the country of Venezuela. Now, in hindsight, all of this was part of the farce to convince Plaintiff that he would be paid when, in fact, they never had the intention to do so.

10. Again and again, Mournes promised that the money was on its way when, in fact, it never was. For example, in one of the many text messages, Mournes falsely stated, "There are 3 contracts € 370 each. 1. US Bank 2. JPMC 3. BofA...(Florida) 1 other to DBS Bank Singapore (we get a 5-point fee)" **See Exhibit D text message**.

11. Almost a year later, Despite Plaintiff's efforts to secure the OFAC filing and assurances from ISDF representatives Defendant Mournes, private investor Mr. Richard Cutshall, and Mr. Ronald A. Oleynik Esq. about securing funds from various sources[4], the payments were

---

ensuring BCV's full responsibility for the renewal and confirming the legal and procedural compliance required for the bonds' assignment and use.

[4] Defendants assured that a purported African source, a "Mr. Gordon" in Europe, and others would have the money necessary to ensure the Plaintiffs payment.

not made.  Plaintiff continued to face delays and changing conditions from ISDF representatives to get his payment.

12. Again, to solidify the conspiracy and fraud, in February 2024, during a meeting at the Hyatt Hotel here in Miami-Dade County, Florida, Defendant Mournes and Mr. Richard Cutshall reiterated their commitment to resolving the RWA payment issues.  Despite these commitments, no payments were made, leading to further complications and difficulties, including threats and extortion incidents in Venezuela.

13. By this time, co-conspirators were engaged in a conspiracy to defraud their lenders. This can be seen when, in February 2023, Mournes sent a letter to the plaintiff to show that he was actively looking for money to pay him. These letters were sent to him to provide comfort that the money was on the way.  None of this money ever materialized, and the Plaintiff was never paid. **See Exhibit E letter from Kalob Arch partner.**

14. Almost a year had passed, and finally, on or about March 15, 2024, Mournes, the mastermind in the conspiracy, convinced the Plaintiff that before he could get paid, he needed to ensure that the Venezuelan government would guarantee the proposed investment in petroleum and electricity and monetize the bonds because ISDF had the financial backing. **See Exhibit F, letter from Mournes.**

15. Plaintiff then engaged in significant efforts to facilitate the Defendants' business operations and secure necessary approvals, which included multiple international trips. The first trip to Panama occurred from March 18, 2024, until March 23, 2024.  During this trip, the following individuals were in attendance at the JW Marriott in Panama City: Ron Oleynik, David Rex Henderson, Francisco Sanchez, Richard Cutshall, John Harris, and Plainitff.  The purpose of this trip was to obtain visas for travel to Venezuela to further the business dealings and secure necessary documentation for the Defendants' operations.

16. The second trip took place from March 31, 2024, until April 5, 2024, and involved travel from Panama to Venezuela and back to Panama, then to Miami. The attendees of this trip included David Rex Henderson, Richard Cutshall, and Plaintiff. During this trip, the group traveled to Venezuela, where an ISDF presentation was made, and approval was obtained to present more financial information and sign agreements with lawyers representing Venezuela in France (specifically from Dentons law firm, represented by David Syed). It should be noted that although Richard Cutshall's visa was approved, he did not travel to Venezuela due to confusion with the visa process.

17. Throughout both trips, discussions were consistently held regarding the investment plans for various projects and the monetization of the bonds. Plaintiff emphasized the importance of demonstrating financial capacity in Venezuela for these projects. Plaintiff also insisted that his demands for payment of $6,800,000 be addressed due to his commitments and the extensive efforts and services he had provided.

18. Despite the approvals and significant efforts made during these trips, the Defendants continued to delay payment of the RWA, exacerbating his financial distress and leading to further complications.

19. While getting visa approvals to the ISDF representatives, after a Venezuelan background check, Plaintiff found out that Mournes, Zouvas, and Ekstrom had been involved in fraud[5] dealings using Venezuelan bonds in the past. Venezuela denied their visas.

20. On the March 2024, trip to Venezuela with Mr. David R. Henderson, nominated as the representative of ISDS in Venezuela, stood for a face-to-face meeting with the Venezuelan secretary of commerce. However, challenges persisted due to outstanding debts and complexities

---

[5] *Watchous Enterprises, LLC v. Pac. Nat'l Capital,* 16-1432-JTM, 2020 WL 1233753 (D. Kan. Mar. 13, 2020), order clarified, 16-1432-JTM, 2020 WL 6078170 (D. Kan. Oct. 15, 2020), aff'd sub nom. *Watchous Enterprises, LLC v. Mournes*, 87 F.4th 1170 (10th Cir. 2023).

stemming from ISDF's financial and administrative issues. Despite these obstacles, in several text messages and phone calls with Plaintiff, Mr. Ronald A. Oleynik Esq. and private investor Mr. Richard Cutshall reiterated their dedication to paying what was already owed to Plaintiff, yet once more, no payment was forthcoming.

21. Shortly after coming back from Venezuela on or about April 5, 2024, Mr. David R. Henderson, sent an email praising and affirming Plaintiffs work and collaboration: "The dislike for Americans in Caracas was palpable. Even Jose was visibly stressed. Without his contacts and the services they provided, I would have taken the first flight out. Jose's continued participation and support are crucial from my point of view..." Henderson wrote.

22. On or about May 30, 2024, to legitimize the falsehood of Plaintiff getting paid and propagate Mournes' fraud, Ekstrom, Henderson, and Mr. Richard Cutshall sent a purported RWA from MAGMA, affirming MAGMA's commitment and capability to form a strategic partnership with ISDF, Petroleos de Venezuela, SA (PDVSA), and Banco Central de Venezuela (BCV). The attached MAGMA RWA is incorporated by reference as **Exhibit G**.

23. To this day, Mournes and his co-conspirators continue to use ISDF and the RWA bonds obtained by Plaintiff to defraud "investors."

24. Plaintiff did not know that Defendant Mournes' statements and purported assuring documents were false and detrimentally and reasonably relied upon the false documents and statements. As a result of the false statements, false documents, false promises, and false invoices, Plaintiff suffered damages in the amount of $6,800,000.00, exclusive of interest, attorney's fees, and costs.

25. After months of requesting payments, Ekstrom finally made several excuses in order to justify Mournes and to cover the conspiracy. They also finally acknowledged that ISDF

nor Waterfall had any money and the funds paid to Plaintiff despite all the work that he had done for the company, confirming the fraud.

26. Defendant Mournes's modus operandi at this point was now apparent, as he had created another[6] scheme to defraud, now acting on behalf of ISDS, wherein the company executives are fully aware of the details of the fraudulent scheme as demonstrated by their actions and text messages exchanged. The following entities, all tainted by fraud and **all now defunct**, were created by Mournes: Waterfall Mountain LLC d/b/a the Waterfall Mountain Group, Waterfall Mountain International Holdings Limited, and Waterfall Mountain USA LLC.[7] It is clear that Mournes and its co-conspirators created ISDF solely to continue defrauding investors because Waterfall already had several million creditors and lawsuits pending.

27. ISDF continued to promise payment without fulfilling their financial obligations, leading to significant financial and personal harm to Plaintiff. This includes severe financial distress, health deterioration, and damage to professional relationships.

28. After Plaintiff started getting suspicious about the Defendants' fraud and their failure to pay for his services, on or about January 12, 2024, Plaintiff was subjected to physical threats and coercion by Defendant Mournes, who visited Plaintiff's home here in Miami-Dade County Florida, made threatening phone calls, and claimed to be a member of the CIA, threatening to use his contacts to harm Plaintiff.

---

[6] US FED LAWSUITS: 2:24-cv-01956-PSG-KS; 2:24-mc-00032-UA; 6:16-cv-01432-DDC among others. One court found that Defendant Mournes had "disastrous credit and judgment histories" and was "adept…in devising complex methods to obfuscate [his] transactions." Titan Management, L.P. et al. v. James J. Licata, et al., Trial Superior Court of New Jersey, Docket No. L-7709-13, Trial Court Opinion, June 2, 2015, available at https://www.judiciary.state.nj.us/opinions/business/complex_business/MOCCO%20V%20%20L ICATA%20OPINION%20ESX_L_7709_13%20Rothschild%20(Business%20Governance%20O wnership%20Disputes).pdf.

[7] *Watchous Enterprises, LLC v. Pac. Nat'l Capital,* 16-1432-JTM, 2020 WL 1233753 (D. Kan. Mar. 13, 2020), order clarified, 16-1432-JTM, 2020 WL 6078170 (D. Kan. Oct. 15, 2020), aff'd sub nom. *Watchous Enterprises, LLC v. Mournes*, 87 F.4th 1170 (10th Cir. 2023).

29. Defendants' refusal to pay for services rendered, along with the threats and coercion, has caused severe emotional distress and financial harm to Plaintiff.

30. Plaintiff seeks to recover the outstanding amount of $6,800,000 for services rendered, as well as damages for the emotional distress and financial harm suffered due to Defendants' actions.

31. Because Plaintiff is now certain of Defendants' misrepresentations, lies, and excuses and continued to demand his hard-earned money with no avail or answer, Plaintiff has been required to engage the services of the undersigned attorney in this action and is obligated to pay attorneys' fees for their services.

32. All conditions precedent to the filing and maintenance of this action have been performed excused, satisfied, or waived.

## COUNT I - BREACH OF CONTRACT
### (against all Defendants)

33. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 32 as if fully set forth herein.

34. Plaintiff and Defendants entered into an agreement whereby Plaintiff would provide consulting and advisory services to Defendants in exchange for payment of $6,800,000.

35. Plaintiff performed all conditions, covenants, and promises required on his part to be performed in accordance with the terms and conditions of the agreement.

36. Defendants breached the agreement by failing and refusing to pay Plaintiff the agreed-upon amount of $6,800,000.

37. As a direct and proximate result of Defendants' breach, Plaintiff has suffered damages in the amount of $6,800,000, plus interest, costs, and attorneys' fees.

38. Additionally, Defendants' failure to fulfill their payment obligations has caused Plaintiff significant financial distress, forcing him to incur debts and financial obligations to sustain his business operations and personal livelihood.

39. The breach of contract by Defendants has damaged Plaintiff's reputation and business relationships, as he relied on the expected payments to honor commitments made to third parties.

**COUNT II - UNJUST ENRICHMENT**
**(against all Defendants)**

40. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 32 as if fully set forth herein.

41. Plaintiff conferred a benefit upon Defendants by providing consulting and advisory services.

42. Defendants appreciated, accepted, and retained the benefit conferred by Plaintiff under circumstances that make it inequitable for Defendants to retain the benefit without paying Plaintiff its value.

43. Defendants have unjustly enriched themselves by utilizing Plaintiff's services to secure business opportunities, regulatory approvals, and financial benefits without compensating Plaintiff for his work.

44. Plaintiff has been deprived of the reasonable value of his services, resulting in financial hardship and loss of income.

45. As a result, Plaintiff is entitled to recover the reasonable value of the services provided to Defendants in the amount of $6,800,000, plus interest, costs, and attorneys' fees.

**COUNT III - FRAUDULENT MISREPRESENTATION**
**(against all Defendants)**

46. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 32 as if fully set forth herein.

47. Defendants, through their representatives, knowingly made false statements, false documents, and misrepresentations to Plaintiff regarding the payment for services rendered.

48. Defendants made these false statements and false documents with the intent to induce Plaintiff to provide services without timely payment.

49. Plaintiff relied on Defendants' false statements to his detriment, providing extensive services under the belief that he would be compensated as agreed.

50. Defendants continued to make false assurances and promises of payment, knowing that they had no intention of fulfilling their financial obligations to Plaintiff.

51. Plaintiff incurred significant costs and expenses in reliance on Defendants' fraudulent misrepresentations, including travel expenses, legal fees, and operational costs.

52. As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff has suffered damages in the amount of $6,800,000, plus interest, costs, and attorneys' fees.

### COUNT IV - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(against Mournes)**

53. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 32 as if fully set forth herein.

54. Mr. Mournes visited Plaintiff's home, made threatening phone calls, and claimed to be a member of the CIA, threatening to use his contacts to harm Plaintiff.

55. Defendants' conduct, including the failure to pay for services rendered and the threats made by its representatives, was extreme and outrageous.

56. Defendants' conduct was intended to and did cause severe emotional distress to Plaintiff.

57. Plaintiff has suffered severe emotional distress, anxiety, and mental anguish as a direct result of Defendants' actions.

58. Defendants' threats and coercion have caused Plaintiff to fear for his safety and the safety of his family, resulting in additional stress and emotional trauma.

59. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered severe emotional distress and related damages, including medical expenses for treatment of stress-related conditions.

**COUNT V - CIVIL CONSPIRACY**
**(against all individual Defendants)**

60. Plaintiff realleges and incorporates by reference the allegations set forth in paragraphs 1 through 32 as if fully set forth herein.

61. Defendants entered into an agreement to do an unlawful act or to do a lawful act by unlawful means.

62. Defendants engaged in an overt act in pursuance of the conspiracy, including making false statements, creating false documents, and defrauding Plaintiff of his earned money.

63. Defendants' actions in furtherance of the conspiracy included the following:

a. Coordinated efforts to delay payment to Plaintiff while falsely assuring him that payment was forthcoming.

b. Engaging in fraudulent schemes to misuse the RWA bonds and deceive both Plaintiff and potential investors.

c. Utilizing false promises and fraudulent documents to maintain the pretense of legitimate business operations and secure Plaintiff's continued cooperation.

64. The conspiracy among Defendants was designed to enrich themselves at the expense of Plaintiff by exploiting his services and depriving him of rightful compensation.

65. As a result of the acts done under the conspiracy, Plaintiff suffered damages in the amount of $6,800,000, plus interest, costs, and attorneys' fees.

66. Plaintiff's financial losses and emotional distress are directly attributable to the coordinated and deceitful actions of Defendants in furtherance of their conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Adelai Jose Tineo respectfully requests that this Court enter judgment in his favor and against all Defendants jointly and severally and award the following relief:

A. Compensatory damages in the amount of $6,800,000;

B. Pre- and post-judgment interest as allowed by law;

C. Attorneys' fees and costs of this action;

D. Punitive damages; and

E. Such other and further relief as the Court deems just and proper.

Dated: June 10, 2024

Respectfully submitted,

By: /s/ Edmar M. Amaya
Edmar M. Amaya, Esq. LL.M.
Florida Bar No. 063816
EDAM LAW - TRIAL ATTORNEYS
Latitude One Office Tower
175 SW 7th Street, Suite 2410
Miami, FL 33130
Tel: +1 (305) 643-0740
Email: edmar.amaya@edamlaw.com

Counsel for Plaintiff Adelai Jose Tineo